**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KEVIN JACKSON,

*Plaintiff*,

v.

ALEJANDRO N. MAYORKAS,

*Defendant*.

Civil Action No. 23-2432 (LLA)

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kevin Jackson brings this action against Defendant Alejandro N. Mayorkas in his official capacity as Secretary of Homeland Security. Mr. Jackson alleges that his former employer, the Department of Homeland Security ("DHS"), subjected him to a hostile work environment on the basis of race, sex, and reprisal and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Pending before the court is the Secretary's motion to dismiss or, in the alternative, for partial summary judgment. For the reasons explained below, the court will grant the Secretary's motion to dismiss in part and deny it in part, and it will deny the Secretary's motion for summary judgment as moot.

**I.      Factual Background**

In resolving the Secretary's motion, the court accepts the following factual allegations from Mr. Jackson's complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Mr. Jackson is an African American man who worked as a GS-14 Management Analyst in DHS's Identity and Information Management Division ("IIMD") from June 2017 to November 2020. ECF No. 1 ¶ 3. On July 6, 2017, his fifth day of work at IIMD, Mr. Jackson encountered his white, male co-worker, Evgeni Dobrev, in the restroom. *Id.* ¶ 24. At the time,

Mr. Dobrev held a supervisory position at DHS, but he was not Mr. Jackson's supervisor.  *Id.* ¶ 25.  Mr. Dobrev stood in front of Mr. Jackson, "blocking his access to the towels, so that Mr. Jackson could not dry his hands," and he "began interrogating Mr. Jackson and repeatedly asking him where his supervisor was."  *Id.* ¶¶ 26-27.  Mr. Dobrev's tone was "aggressive" and "dismissive," and his presence was "menacing."  *Id.* ¶ 28.  Mr. Jackson, startled and confused, "held up his hands to signal to Mr. Dobrev that he should back off and responded that he did not know the answers to Mr. Dobrev's question[s]."  *Id.* ¶ 30.  Mr. Dobrev, "apparently playing some kind of game with Mr. Jackson," then told Mr. Jackson that he knew where Mr. Jackson's supervisor was.  *Id.* ¶ 31.  Mr. Dobrev "continued to hold Mr. Jackson hostage while he talked to him about issues at work totally unrelated to [him]."  *Id.* ¶ 33.

Later that same day, Mr. Jackson again encountered Mr. Dobrev in the restroom.  *Id.* ¶ 34.  Mr. Dobrev asked Mr. Jackson, in an accusatory tone, why he was using the third-floor men's room even though his office was on the second floor.  *Id.* ¶¶ 35-36.  Mr. Jackson initially thought that Mr. Dobrev was joking.  *Id.* ¶ 37.  But as Mr. Dobrev's questions "became increasingly persistent and intense," Mr. Jackson became uncomfortable.  *Id.*  He responded that he had a right to use any restroom he wanted and exited the restroom.  *Id.* ¶ 38.  As Mr. Jackson walked back to his office, Mr. Dobrev followed him "with his eyes glued to Mr. Jackson's rear end."  *Id.* ¶¶ 39-41.  When Mr. Jackson returned to his cubicle, Mr. Dobrev "walked slowly past Mr. Jackson's desk with a menacing and intimidating demeanor."  *Id.* ¶ 43.

Mr. Jackson immediately reported Mr. Dobrev's behavior, first to supervisor Magda Ortiz, and then to his first-level supervisor, Chris Walsh, and his second-level supervisor, Paul Johnson.  *Id.* ¶¶ 45-48.  Mr. Walsh and Mr. Johnson "strongly agreed" that Mr. Jackson and Mr. Dobrev

needed to be separated, and Mr. Johnson said that he would speak to Mr. Dobrev about the situation. *Id.* ¶¶ 50-51.

Over the next several months, Mr. Jackson's co-worker, Darrell Enoch—the only other African American male employee in Mr. Jackson's branch—"began telling Mr. Jackson about the ways in which Mr. Dobrev, who was Mr. Enoch's first-line supervisor, had been sexually harassing him." *Id.* ¶¶ 53-54.  Mr. Dobrev "wrote words of a sexual nature to Mr. Enoch," "gave Mr. Enoch female perfume samples and told Mr. Enoch he should choose one of the fragrances and wear it," "talked about unzipped pants in Mr. Enoch's presence," and "would get uncomfortably close to Mr. Enoch and breathe on him." *Id.* ¶¶ 56-59.  These reports "exacerbated Mr. Jackson's concerns for his job and his safety." *Id.* ¶ 55.  He began to leave the building to take bathroom breaks "despite rain, snow, and bitterly cold temperatures because he feared that Mr. Dobrev would assault him in one or more of the bathrooms in the [DHS] building." *Id.* ¶ 62.

In November 2017, Mr. Enoch filed an Equal Employment Opportunity ("EEO") complaint against DHS, "alleging that Mr. Dobrev was harassing him and creating a hostile work environment." *Id.* ¶ 65.  At some point, Mr. Jackson formally agreed to serve as a witness for Mr. Enoch. *Id.* ¶ 66.

In December 2017, Mr. Johnson invited Mr. Dobrev to a meeting with Mr. Jackson, "contrary to [Mr. Johnson's] earlier agreement" to separate the two, and despite the fact that there was "no reason for [Mr. Dobrev's] presence." *Id.* ¶¶ 67-68.  Mr. Jackson protested, and Mr. Johnson reiterated that he would talk to Mr. Dobrev. *Id.* ¶¶ 69-70.

In January 2018, Mr. Dobrev "held a loud conversation" with two colleagues in cubicles next to Mr. Jackson's. *Id.* ¶ 71.  After saying a loud goodbye to his colleagues, Mr. Dobrev said, "and you, too, Kevin"—an interaction that Mr. Jackson claims violated DHS's "alleged no contact

order" between the two men.  *Id.*  Mr. Jackson complained to Mr. Johnson, who again said that he would talk to Mr. Dobrev.  *Id.* ¶ 72.  Mr. Jackson further alleges that, "[c]ontrary to the DHS's Anti-Harassment Program . . . even after [he] had complained three times" about Mr. Dobrev's harassment, "DHS conducted no fact finding, did no investigation, spoke with no witnesses, and issued no reports."  *Id.* ¶ 73.

In mid-January 2018, the federal government closed due to a lapse in appropriations.  *See id.* ¶ 74; ECF No. 36-1, at 4.  Mr. Jackson was not informed that DHS was unaffected by the government shutdown, and he therefore did not report to work.  ECF No. 1 ¶ 75.  DHS management contacted Mr. Jackson to ask why he was not at work and ultimately required him to take a day of leave.  *Id.* ¶¶ 76-77.

In April 2018, DHS promoted Mr. Dobrev and made him Mr. Jackson's acting second-line supervisor.  *Id.* ¶ 80.  The agency also changed Mr. Jackson's work duties: he was "removed from policy making and reassigned to clerical work," which was "a severe diminution of his duties and responsibilities that was inconsistent with his knowledge and qualifications."  *Id.* ¶ 82.  On April 19, 2018, Mr. Jackson requested that he be reassigned to a position outside of Mr. Dobrev's chain of command, but DHS refused.  *Id.* ¶¶ 83-84.

Mr. Jackson contacted an EEO counselor on April 25, 2018, complaining of harassment and retaliation.  *Id.* ¶ 85.  He filed a formal EEO complaint on June 20, 2018.  *Id.* ¶ 15.  In his complaint, Mr. Jackson indicated that DHS had discriminated against him on two bases: race and "retaliation/reprisal for prior EEO activity."  ECF No. 36-6 (Ex. D), at 2.  He included an addendum to the complaint, alleging that the agency had "engaged in an ongoing pattern and practice of discrimination . . . on the basis of race (African-American) and retaliation (for reporting and opposing discrimination)."  *Id.* at 3.  The Office of Federal Operations within the Equal

4

Employment Opportunity Commission ("EEOC") issued a decision in favor of the agency on June 2, 2022.  ECF No. 1 ¶ 18.  In the meantime, Mr. Jackson left DHS due to "significant emotional plan and suffering."  *Id.* ¶ 87.

## II.     Procedural History

Mr. Jackson timely filed this action on August 30, 2022, alleging that DHS had subjected him to a hostile work environment on the basis of sex (Count I), race (Count II), and reprisal (Count III), and retaliated against him (Counts IV and V), all in violation of Title VII.[1]   *Id.* ¶¶ 88-92; ECF No. 36-1, at 5.  The Secretary moves to dismiss all counts pursuant to Federal Rule of Civil Procedure 12(b)(6) and alternatively moves for summary judgment on Counts IV and V. ECF No. 36.

## III.     Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff pleads facts that are more than "'merely consistent with' a defendant's liability" and that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 557); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires 'more than a sheer possibility that a defendant has acted unlawfully.'" (quoting *Iqbal*, 556 U.S. at 678)).  "A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'"  *Banneker*

---

[1] Mr. Jackson initially filed this action in the U.S. District Court for the District of Maryland, ECF No. 1, which transferred the action for lack of venue, ECF No. 30.

*Ventures, LLC*, 798 F.3d at 1129 (alterations in original) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

In deciding a motion under Rule 12(b)(6), a court must consider the whole complaint, accepting all factual allegations in the complaint as true, "even if doubtful in fact," and construing all reasonable inferences in the plaintiff's favor. *Twombly*, 550 U.S. at 555. However, a court need not "accept inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations in original) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)); *see Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alteration in original) (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)).

## IV.    Discussion

The Secretary moves to dismiss pursuant to Rule 12(b)(6), arguing that Mr. Jackson (1) failed to administratively exhaust his sex-based hostile work environment claim and certain incidents relevant to his race- and reprisal-based hostile work environment claims; (2) fails to state a race-based hostile work environment claim; and (3) fails to state claims for retaliation, either as freestanding claims or as the basis for a reprisal-based hostile work environment claim. ECF No. 36-1, at 1-2. The Secretary also moves, in the alternative, for summary judgment on Mr. Jackson's freestanding retaliation claims. *Id.* at 30-32. The court addresses each in turn.

### A.    Administrative Exhaustion

The parties agree that Mr. Jackson administratively exhausted some aspects of his hostile work environment claims based on race (Count II) and reprisal (Count III).  *See* ECF No. 36-1, at 11-12; ECF No. 39, at 7.  However, the Secretary argues that Mr. Jackson failed to raise his sex-based hostile work environment claim (Count I) and several incidents relevant to his race- and reprisal-based hostile work environment claims before the agency.  *See* ECF No. 36-1, at 10-16.

"Before bringing Title VII . . . claims to court, federal employees must administratively exhaust their claims."  *Coleman v. Duke*, 867 F.3d 204, 206 (D.C. Cir. 2017).  To do so, the employee must first contact an EEO counselor to report the alleged discrimination within forty-five days of its occurrence.  29 C.F.R. § 1614.105(a)(1).  If counseling is unsuccessful, the employee may then file an administrative complaint, *see id.* § 1614.105(d), which "serves the important purpose of giving the charged party notice of the claim," *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995).  While the administrative charge requirement "should not be construed to place a heavy technical burden on 'individuals untrained in negotiating procedural labyrinths,' . . . [a] court cannot allow liberal interpretation of an administrative charge to permit a litigant to bypass the Title VII administrative process."  *Park*, 71 F.3d at 907 (quoting *Loe v. Heckler*, 768 F.2d 409, 417 (D.C. Cir. 1985)).  Because the failure to exhaust administrative remedies is an affirmative defense, the defendant bears the burden to plead (and ultimately, prove) the plaintiff's failure to exhaust.  *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).

As a threshold matter, the court takes judicial notice of (1) Mr. Jackson's EEO complaint, filed with the agency on June 20, 2018, including Mr. Jackson's addendum to that complaint, ECF No. 36-6 (Ex. D); and (2) the agency's notice of charge dated July 3, 2018, informing Mr. Jackson that his complaint had been accepted, ECF No. 36-7 (Ex. E).  At the motion-to-dismiss stage, the court may take judicial notice of public records and documents that "are referred to in the

complaint and are integral to [the plaintiff's] . . . claim." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).  In the context of administrative exhaustion, district courts routinely take notice of the plaintiff's EEO complaint and notice of charge without converting a motion to dismiss into one for summary judgment.  *See Vasser v. McDonald*, 228 F. Supp. 3d 1, 9-10 (D.D.C. 2016).  Courts "treat[] attachments to an EEO complaint," such as Mr. Jackson's addendum, "as part of the complaint itself and a basis for articulating claims." *Crawford v. Duke*, 867 F.3d 103, 107 (D.C. Cir. 2017).

### 1.    Sex-based hostile work environment claim

In his EEO complaint, Mr. Jackson indicated that DHS had created a hostile work environment on two bases: race and reprisal.  ECF No. 36-6 (Ex. D), at 2.  He included an addendum to the complaint, alleging that the agency "engaged in an ongoing pattern and practice of discrimination . . . on the basis of race (African-American) and retaliation (for reporting and opposing discrimination)." *Id.* at 3.  In the addendum, Mr. Jackson describes his interactions with Mr. Dobrev, stating that Mr. Dobrev "hastily questioned" Mr. Jackson about his supervisor's whereabouts and why he was using the third-floor bathroom and followed Mr. Jackson from the bathroom back to his workstation.  *Id.* at 3 ¶ 2.  The EEO complaint and addendum included no facts to suggest that Mr. Dobrev had discriminated or harassed Mr. Jackson on the basis of sex— for example, they did not include the fact that Mr. Dobrev had allegedly followed Mr. Jackson "with his eyes glued to Mr. Jackson's rear end."  ECF No. 1 ¶ 39.

Mr. Jackson himself states in his complaint that he "timely raised the issue of harassment in this case, including harassment based on his race (African American) and reprisal (for opposing harassment and discrimination and participating in the EEO process)," but that he is only now, before the district court, "adding the basis of sex to his harassment claim." *Id.* ¶¶ 20-21.  In opposition to the Secretary's motion to dismiss, Mr. Jackson seems to reverse course.  There, he

argues that he raised a sex-based hostile work environment claim before the agency because, on October 31, 2018, he told the EEO investigator that "the way Mr. Dobrev watched, stared, and followed me from the third floor bathroom and down the stairwell . . . was also of a sexual nature. When he was staring at and watching me, it was like he was looking at my backside, not my face." ECF No. 36-4 (Ex. B), at 3; ECF No. 39, at 7.  This statement is not part of Mr. Jackson's EEO complaint or addendum—rather, Mr. Jackson shared this information in an affidavit as part of the EEO investigation months after the agency accepted his complaint.[2]  *See generally* ECF No. 36-4 (Ex. B).  "[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role."  *Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (alteration in original) (quoting *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989)); *see Sims v. Sunovion Pharms., Inc.*, No. 17-CV-2519, 2019 WL 690343, at *9 (D.D.C. Feb. 19, 2019) ("Plaintiff's citation to a single mention of sex in her 94-page EEOC file does not remedy her failure to allege sex discrimination in her EEOC charge.").  The Secretary is therefore correct that Mr. Jackson did not properly raise a sex-based hostile work environment claim during the administrative process.

Mr. Jackson argues, in the alternative, that his sex-based hostile work environment claim is properly before the court because it is "like or reasonably related to the allegations" raised in his administrative complaint.  ECF No. 39, at 8; *see Park*, 71 F.3d at 907.  As a threshold matter, it is unclear whether the "like or reasonably related to" test—articulated by the D.C. Circuit in *Park v.*

---

[2] For this reason, it is also unclear whether the court may properly take judicial notice of the affidavit without converting the Secretary's motion to dismiss into one for summary judgment. *See, e.g.*, *Ahuja v. Detica Inc.*, 742 F. Supp. 2d 96, 103 (D.D.C. 2010) (converting a motion to dismiss into a motion for summary judgment because the parties relied on exhibits beyond the Plaintiff's EEOC complaint and notice of charge); *Latson v. Holder*, 82 F. Supp. 3d 377, 386 (D.D.C. 2015) (same).  But the court need not address this question because, regardless, the affidavit cannot cure Mr. Jackson's failure to raise a sex-based claim in his EEO complaint.

*Howard University*, 71 F.3d 904, 907 (D.C. Cir. 1995)—remains good law.  *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (declining to decide whether the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), overruled *Park*); *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164 (D.D.C. 2016) ("There is some disagreement in the case law about whether an employee's eventual lawsuit is limited to claims included in the administrative complaint or whether the employee may also bring suit for 'claims that are like or reasonably related to the allegations' in the complaint." (quoting *Park*, 71 F.3d at 907)).  However, the court need not address that question today because, even if *Park* remains good law, Mr. Jackson's sex-based claim is not "like or reasonably related to" his race and reprisal claims. *See Hicklin v. McDonald*, 110 F. Supp. 3d 16, 20 (D.D.C. 2015) (taking the same approach).

Mr. Jackson argues that his sex-based hostile work environment claim is "like or reasonably related to" his race and reprisal claims because it "is supported by the facts" alleged in his administrative complaint.  *See* ECF No. 1 ¶ 21; ECF No. 39, at 8.  But "Plaintiff's argument conflicts with a long line of cases in this Circuit that . . . prevent plaintiffs from conflating ideologically distinct categories of discrimination for purposes of meeting their exhaustion requirements."  *Casole v. Johanns*, 577 F. Supp. 2d 138, 142 (D.D.C. 2008) (holding that the plaintiff had failed to exhaust a discrimination claim on the basis of national origin, although it arose from same incidents as the gender discrimination and retaliation claims properly raised in his administrative complaint); *see Siegel v. Kreps*, 654 F.2d 773, 777 (D.C. Cir. 1981) (holding that the plaintiff had failed to exhaust a claim of religious discrimination, although it arose from the same incidents as the age discrimination claim properly raised in his administrative complaint).  The court therefore concludes that Mr. Jackson failed to administratively exhaust his sex-based hostile work environment claim and will dismiss Count I on that basis.

**2.      Incidents relevant to Mr. Jackson's race- and reprisal-based hostile work environment claims**

As noted, to timely exhaust a claim, an employee must contact an EEO counselor to report alleged discrimination within forty-five days of the incident.  *See* 29 C.F.R. § 1614.105(a)(1). Mr. Jackson initiated contact with an EEO counselor on April 25, 2018, one week after his allegedly retaliatory change in work assignment.  ECF No. 1 ¶¶ 14, 85.  The Secretary argues that Mr. Jackson failed to timely raise the following six incidents relevant to his race- and reprisal-based hostile work environment claims because they occurred more than forty-five days before April 25, 2018.  Specifically:

- on July 6, 2017, Mr. Dobrev spoke to Mr. Jackson in the second-floor bathroom;

- on July 6, 2017, Mr. Dobrev spoke to Mr. Jackson in the third-floor bathroom;

- on July 6, 2017, Mr. Dobrev followed Mr. Jackson from the third-floor bathroom to Mr. Jackson's workspace on the second floor;

- in  December 2017, DHS invited Mr. Dobrev to attend a meeting at which Mr. Jackson was present;

- in January 2018, Mr. Dobrev spoke with Mr. Jackson; and

- on or about January 19, 2018, DHS failed to inform Mr. Jackson that he was required to be present for work.

ECF No. 36-1, at 14-15.

It is significant that Mr. Jackson raises these allegations in support of his hostile work environment claims, not as mere discrimination or retaliation claims.  Because a hostile work environment claim is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice' . . . [i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period." *Morgan*, 536 U.S. at 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may

be considered by a court for the purposes of determining liability." *Id.*  Mr. Jackson has done so here, because he initiated contact with an EEO counselor fewer than forty-five days after "an act contributing to the [hostile work environment] claim"—namely, DHS's allegedly retaliatory reassignment decision.  ECF No. 1 ¶¶ 14, 85.

The Secretary argues that Mr. Jackson may not benefit from this more permissive rule because "[t]he timely events in April 2018 are not sufficiently connected to salvage the untimely ones."  ECF No. 36-1, at 15.  As the D.C. Circuit has explained, incidents that fall within and outside the statute of limitations "can qualify as 'part of the same actionable hostile environment claim' only if they are adequately linked into a coherent hostile environment claim—if, for example, they 'involve[ ] the same type of employment actions, occur[ ] relatively frequently, and [are] perpetrated by the same managers.'"  *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (alterations in original) (quoting *Morgan*, 536 U.S. at 120-21).  The first five events meet that requirement.  Although the initial July 2017 incidents are somewhat distant in time from the December 2017 and January 2018 incidents, they are all substantively linked to the alleged April 2018 retaliation.  When Mr. Jackson reported the July 2017 incidents to his supervisors, "they strongly agreed that Mr. Jackson and Mr. Dobrev needed to be separated."  ECF No. 1 ¶ 50. The December 2017 and January 2018 incidents demonstrate that DHS did not successfully do so. In April 2018, the agency again failed to keep Mr. Jackson and Mr. Dobrev separate—in fact, it did the opposite when it assigned Mr. Dobrev to be Mr. Jackson's supervisor.  ECF No. 1 ¶¶ 80-81.  Mr. Jackson has thus "adequately linked," *Baird*, 662 F.3d at 1251, timely and untimely incidents by alleging a "common thread," *Mason v. Geithner*, 811 F. Supp. 2d 128 (D.D.C. 2011), *aff'd* 492 F. App'x 122 (D.C. Cir. 2012): DHS's failure to adequately respond to Mr. Dobrev's harassment, *see Vick v. Brennan*, 172 F. Supp. 3d 285, 299 (D.D.C. 2016) (holding that the plaintiff

exhausted untimely incidents where she alleged that the defendant had "engaged in a single multi-year campaign to harass her and remove her from her job, and that this campaign consisted of relatively frequent flare-ups of hostile conduct").  Mr. Jackson has therefore administratively exhausted the first five incidents listed above as they relate to his race- and reprisal-based hostile work environment claims.

However, the sixth incident—DHS's alleged failure to inform Mr. Jackson that he was required to come to work during a government shutdown—is an outlier.  Mr. Jackson does not allege that Mr. Dobrev had any involvement in this incident.  *See* ECF No. 1 ¶¶ 74-79.  It is therefore unclear how this incident is relevant to Mr. Jackson's hostile work environment claims, which center on Mr. Dobrev's harassment and DHS's inadequate response to it.  The court therefore concludes that Mr. Jackson has not administratively exhausted his claim that DHS created a hostile work environment by failing to instruct him to report for work during the January 2018 government shutdown and then requiring him to take a day of leave as a result.

### B.      Race-Based Hostile Work Environment Claim

Mr. Jackson alleges that DHS violated Title VII by subjecting him to a hostile work environment on the basis of race (Count II).[3]  To prove a hostile work environment claim, a plaintiff must show that: (1) he experienced unwelcome harassment; (2) the harassment was because of a protected characteristic; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer.  *See generally Oncale v. Sundowner Offshore Servs.*,

---

[3] Because the court finds that Mr. Jackson failed to exhaust his claim that DHS subjected him to a hostile work environment on the basis of sex (Count I), the court need not consider that claim here.  Additionally, because Mr. Jackson's reprisal-based hostile work environment claim (Count III) involves many of the same standards as his retaliation claim (Counts IV and V), the court will address them together.  *See infra* Part IV(C)(2).

523 U.S. 75 (1998).  "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  "[A] few isolated incidents of offensive conduct do not amount to actionable harassment."  *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002).

The Secretary argues that Mr. Jackson fails to state a race-based hostile work environment claim for three reasons: (1) he fails to plausibly allege that he was harassed because of his race; (2) he fails to plausibly allege that Mr. Dobrev's conduct was sufficiently severe or pervasive; and (3) DHS is not liable for Mr. Dobrev's harassment.  ECF No. 36, at 17-25.

### 1.    "Because of" protected status

The Secretary argues that Mr. Jackson fails to plausibly allege that Mr. Dobrev's actions were "because of" Mr. Jackson's race.  ECF No. 36-1, at 17.  Although none of Mr. Dobrev's "comments or actions directed at [Mr. Jackson] expressly focused on his race," *Baloch*, 550 F.3d at 1201, "incidents need not always bear 'overt discriminatory overtones' to have a linkage to discrimination," *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 13 (D.D.C. 2011) (quoting *Hutchinson v. Holder*, 815 F. Supp. 2d 303, 323 (D.D.C. 2011)).  Facially neutral incidents can support a hostile work environment claim if a "trier of fact could reasonably conclude that they were, in fact, based on the plaintiff's [protected status]." *Graves*, 850 F. Supp. 2d at 13 (alteration in original) (quoting *Mason*, 811 F. Supp. 2d at 180 (D.D.C. 2011)).  Here, Mr. Jackson suggests that Mr. Dobrev's facially race-neutral conduct was in fact racial harassment by offering a comparator: Mr. Enoch.  ECF No. 1 ¶¶ 53-61.

Mr. Jackson alleges that he and Mr. Enoch were the only two African American men employed in their branch, that Mr. Dobrev also harassed Mr. Enoch, and that learning about

Mr. Enoch's experiences "exacerbated Mr. Jackson's concerns for his job and his safety." *Id.* ¶¶ 53-55. Incidents of workplace discrimination or harassment, even those "that did not directly involve the plaintiff[,] may be relevant to whether there is a hostile work environment." *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp. 2d 141, 166-67 (D.D.C. 2013); *see Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008) (holding that, in the context of a hostile work environment claim, courts may consider "acts of harassment of which a plaintiff becomes aware during the period [of] his or her employment, even if the other acts were directed at others and occurred outside of the plaintiff's presence"); *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 110 (3d Cir. 1999) ("Evidence of other acts of harassment is extremely probative as to whether the harassment was . . . discriminatory.").[4] At this early stage of litigation where the court must draw all reasonable inferences in favor of Mr. Jackson, *see Iqbal*, 556 U.S. at 678, the fact that Mr. Dobrev harassed the only other African American man employed in Mr. Jackson's branch gives rise to the reasonable inference that his treatment of Mr. Jackson was racially motivated.

To be sure, the complaint characterizes Mr. Dobrev's treatment of Mr. Enoch as sexual harassment, rather than racial harassment, ECF No. 1 ¶¶ 54, 62—but, at this stage of litigation, this is not fatal to Mr. Jackson's claim of hostile work environment based on race. An employer who harasses an African American man might be harassing him on the basis of race, on the basis

---

[4] The Secretary cites *Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006), for the proposition that discrimination complaints filed by other employees "cannot be used 'as a proxy to establish' discriminatory animus 'where nothing more is known about the nature, merit, or outcome of [those] complaints.'" ECF No. 36-1, at 19 (quoting *Holcomb*, 433 F.3d at 900). But the *Holcomb* Court was considering a motion for summary judgment, where the burden is quite different. *See* 433 F.3d at 895. At the motion-to-dismiss stage, the court must assume the truth of Mr. Jackson's well-pleaded factual allegations—including his allegations that Mr. Dobrev harassed Mr. Enoch. ECF No. 1 ¶¶ 54-59; *see Iqbal*, 556 U.S. at 678. The court cannot consider the "merit" of Mr. Enoch's harassment complaint without converting the motion to dismiss into one for summary judgment.

of sex, or both—and, in all three scenarios, that employer violates Title VII.  *See Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038 (10th Cir. 2020) ("Title VII also prohibits discrimination based on a combination of protected characteristics, such as 'sex-plus-race' discrimination, i.e., discrimination targeted only at employees of a particular race and sex."). While Mr. Jackson has not exhausted a claim for sex-based harassment, *see supra* Part IV(A)(1), his allegations about Mr. Dobrev's treatment of him and Mr. Enoch are sufficient at this stage to suggest that Mr. Dobrev's actions may have been racially motivated.

## 2.    Severe and pervasive

The Secretary argues that Mr. Jackson's race-based hostile work environment claim should be dismissed because he fails to plausibly allege that he suffered severe or pervasive harassment. ECF No. 36-1, at 20-23.  To prevail on a hostile work environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  In determining severity and pervasiveness, the court looks "to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Baird*, 792 F.3d at 169 (quoting *Harris*, 510 U.S. at 23).  "Severity and pervasiveness are complementary factors and often go hand-in-hand, but a hostile work environment claim could be satisfied with one or the other."  *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014).

Mr. Jackson alleges that Mr. Dobrev harassed him in the bathroom twice and followed him to his desk on July 6, 2017, attended a meeting at which Mr. Jackson was also in attendance in December 2017, and briefly spoke to him in January 2018.  ECF No. 1 ¶¶ 24-43, 67-72.  It is

16

unlikely that these sporadic incidents, standing alone, rise to the level of severity and pervasiveness required to support a hostile work environment claim. *See Stewart*, 275 F.3d at 1134 ("[A] few isolated incidents of offensive conduct do not amount to actionable harassment."). However, two components of Mr. Jackson's complaint suggest sufficient severity to survive a motion to dismiss: Mr. Jackson's fear for his physical safety, informed by a co-worker's reports of similar harassment, and DHS's ultimate decision to make Mr. Jackson's alleged abuser his supervisor. ECF No. 1 ¶¶ 53-62, 80.

In assessing severity and pervasiveness, "[t]he standard is an objective one." *Baird*, 792 F.3d at 169. However, courts in this circuit may consider "evidence of [the plaintiff's] mental state" as "further proof upon which a jury could find the existence of a hostile work environment." *Simms v. Ctr. for Corr. Health & Pol'y Stud.*, 794 F. Supp. 2d 173, 193 (D.D.C. 2011); *see, e.g.*, *Hoskins v. Howard Univ.*, 839 F. Supp. 2d 268, 278-79 (D.D.C. 2012); *Craig v. District of Columbia*, 74 F. Supp. 3d 349, 371-72 (D.D.C. 2014). In *Hoskins*, for example, the plaintiff alleged that she "loathed coming to work and was fearful for what actions may be committed against her" and that she took tangible steps to keep herself safe, including "keep[ing] her door closed while she was in the office" and "t[aking] administrative leave to avoid working in the same office as [her abuser]." 839 F. Supp. 2d at 278-79. The court found that, at the motion-to-dismiss stage, these allegations supported the plaintiff's hostile work environment claim. *Id.*

Mr. Jackson similarly alleges that Mr. Dobrev's harassment caused him to fear for his physical safety and that he took steps to protect himself. As Mr. Jackson alleges in the complaint: "he feared that Mr. Dobrev would assault him in one . . . of the bathrooms in the building," and his fear was so profound that he "began to go outside the building for bathroom breaks, which he took at neighboring locations despite rain, snow, and bitterly cold temperatures." ECF No. 1 ¶ 62.

And, although mental state is of course inherently subjective, Mr. Jackson's fear was rooted in objective evidence: a similarly situated co-worker's reports of "flagrant" harassment by Mr. Dobrev. *Id.* ¶¶ 53-62. Thus, while not dispositive, the court finds that Mr. Jackson's well-pleaded fear for his physical safety suggests the severe nature of the harassment.

Finally, looking to "all the circumstances," *Baird*, 792 F.3d at 169 (quoting *Harris*, 510 U.S. at 23), DHS's decision to make Mr. Jackson's alleged abuser his supervisor indicates a hostile work environment. After Mr. Jackson first reported Mr. Dobrev's harassment to his supervisors, "they strongly agreed that Mr. Jackson and Mr. Dobrev needed to be separated." ECF No. 1 ¶ 50. Mr. Jackson repeatedly complained to his supervisors when he had subsequent contact with Mr. Dobrev, and each time his supervisors agreed to "talk to" Mr. Dobrev about the situation. *Id.* ¶¶ 67-72. And yet, DHS still decided to make Mr. Dobrev Mr. Jackson's supervisor. *Id.* ¶¶ 80-81. One of Mr. Jackson's supervisors who had agreed that Mr. Dobrev and Mr. Jackson should be "completely separated" allegedly "knew that Mr. Dobrev was being placed in Mr. Jackson's chain of command and had input into the decision." *Id.* ¶¶ 69, 81. Further, when Mr. Jackson requested that he be reassigned to a position outside of Mr. Dobrev's chain of command, DHS refused his request. *Id.* ¶¶ 83-84.

By making Mr. Dobrev Mr. Jackson's supervisor, DHS made the affirmative decision to place Mr. Dobrev in a position of direct power and authority over his alleged victim. *See* Susan Grover & Kimberley Piro, Essay, *Consider the Source: When the Harasser Is the Boss*, 79 Fordham L. Rev. 499, 513 (2010) ("The power differential between the harassing supervisor and targeted subordinate exacerbates the harm experienced by the subordinate."); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 803 (1998) ("[A]n employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker.").

At the motion-to-dismiss stage, the court finds that such a choice, in and of itself, could plausibly be considered an act of severe harassment.

"Generally, the more severe the conduct, the fewer occurrences necessary to create a hostile work environment." *Burkes v. Holder*, 953 F. Supp. 2d 167, 178 (D.D.C. 2013).  Thus, although Mr. Jackson has not necessarily pleaded "pervasive" harassment, the court finds for the foregoing reasons that he has alleged sufficiently "severe" harassment to support a hostile work environment claim on the basis of race.

### 3.      Liability

DHS argues that it cannot be held liable for Mr. Dobrev's alleged harassment.  ECF No. 36-1, at 24-25.  For Title VII purposes, "it matters whether a harasser is a 'supervisor' or simply a co-worker." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).  "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id.*  But, where the harassing employee is the plaintiff's supervisor, "an employer may be *vicariously* liable for its employees' creation of a hostile work environment." *Id.* at 428.

Mr. Jackson alleges that, during the time period of Mr. Dobrev's harassment, Mr. Dobrev "held a GS-14 supervisory position at the Agency, but he was not Mr. Jackson's supervisor."  ECF No. 1 ¶ 25.  Mr. Jackson does not allege that Mr. Dobrev harassed him after he became his supervisor in April 2018.  *See* ECF 36, at 25; *see generally* ECF No. 1.  "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance*, 570 U.S. at 424. Because Mr. Dobrev was not *Mr. Jackson's* supervisor at the time of the alleged harassment, he was Mr. Jackson's co-worker for Title VII purposes. *Id.* at 428 ("[D]ifferent rules apply where the

harassing employee is the *plaintiff's* "supervisor." (emphasis added)).  Therefore, DHS can only be held liable for Mr. Dobrev's harassment if it was negligent.  *See id.* at 424.

"An employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action."  *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999); *see Burlington Indus. v. Ellerth*, 524 U.S. 742, 759 (1998) ("An employer is negligent with respect to . . . harassment if it knew or should have known about the conduct and failed to stop it.").  Mr. Jackson alleges that each time he reported Mr. Dobrev's conduct, his supervisor said that he would "talk to" Mr. Dobrev about it.  ECF No. 1 ¶¶ 51, 70, 72. He further alleges that, "[c]ontrary to the DHS's Anti-Harassment Program . . . even after [he] had complained three times, DHS conducted no fact finding, did no investigation, spoke with no witnesses, and issued no reports."  *Id.* ¶ 73.

The Secretary argues that DHS took prompt, corrective action because Mr. Jackson's supervisors spoke to Mr. Dobrev about the incidents, and thus the agency was not negligent.  But "cursory efforts to investigate or rectify" alleged harassment do not always suffice.  *Leach v. Nat'l R.R. Passenger Corp.*, 128 F. Supp. 3d 146, 155 (D.D.C. 2015) (holding that a reasonable jury could find the defendant negligent for Title VII purposes where the defendant "undertook only cursory efforts to investigate or rectify [the plaintiff's] repeated complaints, such as merely asking employees whether they had done what [the plaintiff] alleged").  Further, DHS's alleged failure to follow its own internal anti-harassment policies, while not necessarily dispositive, makes it at least plausible that the agency responded negligently to Mr. Jackson's complaints.  *See Hoyle v. Freightliner, LLC*, 650 F.3d 321, 335-36 (4th Cir. 2011) (holding that the defendant's failure to enforce its own anti-harassment policy was relevant to a Title VII negligence inquiry).

Mr. Jackson has therefore done enough, at this early stage, to plausibly allege that DHS failed to take prompt and appropriate corrective action and was thus negligent.

*      *      *

For the foregoing reasons, Mr. Jackson's claim of race-based hostile work environment (Count II) survives the Secretary's motion to dismiss.

### C.      Retaliation Claims

### 1.      Freestanding Retaliation Claims (Counts IV and V)

While a plaintiff need not establish a prima facie case of retaliation to survive a motion to dismiss, he must plead sufficient facts that (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal link connects the protected activity and the adverse action. *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *Pierre v. Bennett*, 686 F. Supp. 3d 1, 9 (D.D.C. 2023). Mr. Jackson alleges that DHS retaliated against him for raising claims of discrimination by reassigning him to a position supervised by Mr. Dobrev (Count IV) and diminishing his work duties (Count V). ECF No. 1 ¶¶ 80-82. The Secretary argues that Mr. Jackson fails to state a claim for retaliation because his July 2017 report of Mr. Dobrev's harassment was not protected activity, his reassignment was not materially adverse, and there was no causal connection between any protected activity and the alleged retaliation. ECF No. 36-1, at 25-30. The court concludes that Mr. Jackson has failed to sufficiently allege a causal link between his protected activity and DHS's materially adverse actions, and it will therefore dismiss his retaliation claims.

### a.      Protected activity

The Secretary argues that Mr. Jackson has failed to sufficiently allege that his July 2017 report of the incidents with Mr. Dobrev was protected activity. ECF No. 36-1, at 26-27. Not so. When Mr. Jackson complained about the incidents to his supervisors, he "told [them] that he felt

21

harassed and mistreated and emphasized that he was concerned about the possible racial motives for Mr. Dobrev's conduct."   ECF No. 1 ¶ 48.   As the Secretary acknowledges, "[a]n internal complaint to management may constitute protected activity so long as the plaintiff 'clearly complain[ed] about discriminatory treatment.'"   ECF No. 36-1, at 27 (quoting *Tucker v. Johnson*, 211 F. Supp. 3d 95, 104 (D.D.C. 2016)).   At the motion-to-dismiss stage, the court will accept Mr. Jackson's allegation as sufficient to allege protected activity.

In addition to his July 2017 report, Mr. Jackson relies on four other instances of protected activity—none of which the Secretary disputes.   Specifically, Mr. Jackson alleges his two additional reports of Mr. Dobrev's harassment in December 2017 and January 2018, his April 2018 request to be transferred to a different supervisor, and his agreement to serve as a witness in Mr. Enoch's EEO investigation.   *See* ECF No. 1 ¶¶ 91-92; ECF No. 39, at 18 (clarifying that "Plaintiff's report in July 2017 . . . repeated in December 2017, January 2018, and April 2018 . . . is an independent basis of Plaintiff's retaliation claim").   The Secretary does not appear to contest any of these.   ECF No. 36-1, at 26-27 (arguing only that Mr. Jackson did not engage in protected activity in July 2017); ECF No. 42, at 9-10 (same).   In the absence of any objection by the Secretary, the court accepts these allegations of protected activity.

### b.   Materially adverse action

In the context of a Title VII retaliation claim, "[a] materially adverse action is one that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).   "Typically, a materially adverse action in the workplace involves a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013).   Whether an action "is

materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71 (internal quotation marks omitted).

Although the D.C. Circuit has "stated that 'a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action,' . . . [it has] also held that '[w]hether a particular reassignment of duties constitutes an adverse action . . . is generally a jury question." *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (first quoting *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999), *overruled by Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (en banc),[5] then quoting *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007)).  In fact, "[t]he court may not take that question away from the jury if a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities." *Czekalski*, 475 F.3d at 365.

In Count IV of his complaint, Mr. Jackson alleges that DHS retaliated against him by assigning him to Mr. Dobrev's supervision.  ECF No. 1 ¶ 92.  In his motion to dismiss, the Secretary argues that Mr. Jackson has not sufficiently alleged that his assignment to Mr. Dobrev's supervision was materially adverse "because Plaintiff offers no allegation how Dobrev's second-line supervision affected the conditions of Plaintiff's employment [and he] does not allege that Dobrev even interacted with Plaintiff during the four months."  ECF No. 36-1, at 27.  As the Secretary points out, Mr. Jackson fails to respond to that argument in his opposition.  *See* ECF No. 39, at 18-19; ECF No. 42, at 10.  Mr. Jackson mentions his reassignment to Mr. Dobrev's

---

[5] *Chambers* overruled *Brody* only in the context of Title VII discrimination claims.  *See Chambers*, 35 F.4th at 876.  In fact, the *Chambers* Court affirmed that a "material adversity" requirement is "entirely consistent" with the objectives of Title VII's antiretaliation provision.  *Id.* at 877.  Thus, *Brody* may still provide guidance in determining whether an action is materially adverse for purposes of a retaliation claim.

supervision only when discussing causation, not in his discussion of materially adverse action, and he cites no legal authority to explain why his assignment to Mr. Dobrev's supervision was materially adverse.  ECF No. 39, at 18-20.  "[T]he Court may treat the plaintiff's failure to oppose the defendant's 12(b)(6) arguments as a decision to concede those arguments."  *Nat'l Sec. Couns. v. C.I.A.*, 898 F. Supp. 2d 233, 268 (D.D.C. 2012), *aff'd* 969 F.3d 406 (D.C. Cir. 2020); *see Shankar v. ACS-GSI*, 258 F. App'x 344, 345 (D.C. Cir. 2007) (concluding that the plaintiff had conceded an issue by failing to respond to an argument made by the defendant in a dispositive motion).  Mr. Jackson has therefore conceded that his reassignment to Mr. Dobrev's supervision was not materially adverse—and without a materially adverse action, there can be no retaliation.  *See Jones*, 557 F.3d at 677.  The court will therefore dismiss Count IV.

In Count V of his complaint, Mr. Jackson alleges that, independent of supervisory changes, he "was removed from policy making and reassigned to clerical work," which was "a severe diminution of his duties and responsibilities."  ECF No. 1 ¶ 82.  The Secretary counters that Mr. Jackson "offers no allegations that his salary, benefits, or title were changed as a result of the reassignment, or that he was precluded from any promotional or other professional opportunities" and, therefore, his reassignment did not result in a "significant" change in work assignments.  ECF No. 36-1, at 28.

*Pardo-Kronemann* presented similar facts.  There, the plaintiff's reassignment "amounted to a transfer from a legal to a non-legal role."  601 F.3d at 608.  Although his salary, benefits, and title remained identical, the Court held that "a reasonable jury could conclude that the transfer . . . was adverse."  *Id.* at 607; *see Behrens v. Tillerson*, 264 F. Supp. 3d 273, 279 (D.D.C. 2017) (holding that the plaintiff had plausibly alleged a materially adverse action where she "was relegated to lower-rung responsibilities").  Here, Mr. Jackson essentially alleges that his

reassignment amounted to a transfer from a policy role to a non-policy role.  *See* ECF No. 39, at 19 (arguing that his "duties shifted from the important work of reviewing and assessing divisional, national, and topical policies and procedures to simply writing documents and agreements regarding access to data").  Drawing all reasonable inferences in his favor, Mr. Jackson—much like the plaintiff in *Pardo-Kronemann*—has sufficiently alleged that his reassignment of duties was materially adverse.

### c.      Causal link

To survive a motion to dismiss a retaliation claim, the plaintiff must allege a sufficient causal link between his protected activity and his employer's adverse action.  *See Jones*, 557 F.3d at 677.  A plaintiff can do so "by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).  "Temporal proximity can . . . support an inference of causation, but only where the two events are 'very close' in time." *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (citation omitted) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).  While there is no bright-line rule, "the Supreme Court has cited circuit decisions suggesting that in some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation."  *Hamilton v. Geithner*, 666 F.3d 1344, 1357-58 (D.C. Cir. 2012).

As noted, Mr. Jackson alleges five possible protected activities: his July 2017, December 2017, and January 2018 reports of interactions with Mr. Dobrev, his April 2018 request to be transferred to a different supervisor, and his agreement to serve as a witness in Mr. Enoch's EEO investigation.  *See* ECF No. 1 ¶¶ 91-92; ECF No. 39, at 18.  Starting with Mr. Jackson's reports of harassment, there are gaps of roughly nine, four, and three months, respectively, between Mr. Jackson's July 2017, December 2017, and January 2018 reports and the diminution of his

duties in April 2018.  Such gaps are too lengthy to establish a causal link based on temporal proximity alone.  *See Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 86 (D.D.C. 2013) (finding that a four-month gap could not support an inference of causation); *Wilson v. Mabus*, 65 F. Supp. 3d 127, 133-34 (D.D.C. 2014) (same); *Taylor*, 571 F.3d at 1322 (D.C. Cir. 2009) (explaining that an "inference of retaliatory motive based upon the 'mere proximity' in time between [the plaintiff's protected activity and adverse action] two and one-half months later would be untenable on the record"); *Baker v. Potter*, 294 F. Supp. 2d 33, 41 (D.D.C. 2003) (finding that a "two-month gap [was] not sufficient to establish the temporal proximity necessary to show a causal connection").

Mr. Jackson's April 2018 transfer request has the opposite temporal problem: it came too late.  Mr. Jackson alleges that he was reassigned to Mr. Dobrev's supervision and assigned different duties on April 18, 2018.  ECF No. 1 ¶ 80.  On April 19, Mr. Jackson asked that he be reassigned to a position outside of Mr. Dobrev's chain of command.  *Id.* ¶ 83.  The April 18 reassignment of duties could not have been in retaliation for a request made on April 19.  *See Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 79 (D.D.C. 2009) ("The fact that the allegedly retaliatory actions preceded the protected activity precludes a determination that the protected activity caused the defendant to retaliate against the plaintiff.").

Mr. Jackson argues that he need not rely on temporal proximity because he has alleged a pattern of retaliation.  *See* ECF No. 39, at 20-21.  It is true that that a plaintiff can establish causation sufficient to survive a motion to dismiss where he "claims that [the] [d]efendant engaged in a pattern of retaliation."  *Davis v. George Wash. Univ.*, 26 F. Supp. 3d 103, 130 (D.D.C. 2014).  In *Davis*, the court found that the plaintiff had established a causal link between the protected activity (taking FMLA leave) and the adverse action (termination) because "every time Plaintiff requested FMLA leave, he was terminated shortly thereafter."  *Id.* at 130.  But here, Mr. Jackson

has alleged two adverse actions—reassignment to Mr. Dobrev's supervision and reassignment of duties—both of which occurred on April 18, 2018. ECF No. 1 ¶¶ 80-82. Thus, Mr. Jackson has not alleged a pattern of retaliation, but rather a string of allegedly protected activity concluding in two retaliatory actions on the same day, months later. This is insufficient to suggest a causal link.

Finally, while Mr. Jackson clearly engaged in protected activity by agreeing to serve as a witness in Mr. Enoch's EEO investigation, he "makes no allegation that any [DHS] official had any knowledge whatsoever [that he had] agreed to act as a witness for Enoch." ECF No. 36-1, at 29.[6]  Rather, Mr. Jackson has alleged only that Mr. Enoch filed an EEO complaint in November 2017 and that he "formally agreed to be a witness in Mr. Enoch's case" at some point. ECF No. 1 ¶¶ 65-66. To be clear, at the motion-to-dismiss stage, Mr. Jackson "needn't provide direct evidence that his supervisors knew of his protected activity; he need only offer circumstantial evidence that could reasonably support an inference that they did." *Jones*, 557 F.3d at 679. But absent *any* factual allegations regarding DHS's knowledge, the court is left to speculate—and, to survive a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Because Mr. Jackson has not sufficiently alleged a causal connection between any protected activity and adverse action, the court will dismiss his remaining retaliation claim (Count V).[7]

---

[6] Mr. Jackson does not respond to this argument in his opposition and has thus conceded the issue. *Nat'l Sec. Couns.*, 898 F. Supp. 2d at 268.

[7] Because the court is granting the Secretary's motion to dismiss Mr. Jackson's retaliation claims (Counts IV and V), it will deny the Secretary's alternative request to enter summary judgment in its favor on these counts as moot.

### 2. Hostile Work Environment Based on Reprisal (Count III)

Mr. Jackson contends that "[t]he same allegations that sufficiently make out causes of action for discrimination based on sex and race also make out a claim for discrimination based on reprisal." ECF No. 39, at 12 n.5. As a threshold matter, a claim of hostile work environment based on reprisal is a claim of retaliation, not discrimination. *Baird*, 662 F.3d at 1250 ("We have previously found that 'a hostile work environment can amount to retaliation under Title VII' if the conduct meets that standard." (quoting *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C. Cir. 2006)). As with other retaliation claims, the plaintiff must allege "a causal connection between the harassment and [the] protected activity." *Moore v. Castro*, 192 F. Supp. 3d 18, 46 (D.D.C. 2016), *aff'd sub nom. Moore v. Carson*, 775 F. App'x 2 (D.C. Cir. 2019) (alteration in original) (quoting *Graham v. Holder*, 657 F. Supp. 2d 210, 216 (D.D.C. 2009)). The Secretary alleges that such a causal connection is lacking. ECF No. 36-1, at 20. The court agrees and will dismiss Count III.

To begin, Mr. Jackson's allegations about his interactions with Mr. Dobrev in July 2017 cannot serve as the basis for a reprisal-based hostile work environment claim because Mr. Jackson had not yet engaged in any protected activity. *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 70 (D.D.C. 2003) ("Plaintiff's concession that the ostracism preceded plaintiff's protected activity is fatal to her retaliation claim as it undercuts proof of causation."). Additionally, Mr. Jackson does not allege that Mr. Dobrev—as opposed to the agency—was retaliating against him for protected activity, ECF No. 1 ¶ 90, so his allegation that Mr. Dobrev spoke to him in January 2018 cannot form the basis of a reprisal-based hostile work environment claim. *Mitchell*, 759 F.2d at 86.

This leaves Mr. Jackson's allegations that DHS invited both Mr. Jackson and Mr. Dobrev to a meeting in December 2017, made Mr. Dobrev his acting supervisor in April 2018, and reassigned his duties in April 2018. ECF No. 1 ¶¶ 67, 80-82. As explained above, Mr. Jackson has conceded that his assignment to Mr. Dobrev's supervision was not materially adverse. *See*

Part IV(C)(1)(b).  But even if the court considered it as part of a reprisal-based hostile work environment claim along with his other two allegations, these isolated incidents do not rise to the level of "sufficiently severe or pervasive" activity to constitute a hostile work environment. *Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21).

## V.   Conclusion

For the foregoing reasons, the Secretary's Motion to Dismiss, ECF No. 36, is hereby **DENIED** as to Count II and otherwise **GRANTED**.  The Secretary shall file an answer on or before October 11, 2024.  Fed. R. Civ. P. 12(a)(4)(A).

**SO ORDERED.**

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: September 27, 2024